## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

v.

**LONNELL G. GLOVER, et al.,**

**Defendants.**

**Criminal Action No.  07-153 (TFH)**

## <u>MEMORANDUM OPINION</u>

Pending before the Court are the following pretrial motions filed by the defendants:

(1) Jerome Hampton's Motion To Dismiss Indictment [Docket No. 210]; (2) Lonnell Glover's

Motion For Discovery Of Co-Defendant And Co-Conspirator Statements [Docket No. 228],

which was joined by John Smith, Velma Williams and Charles Gladden; (3) Lonnell Glover's

Motion To Disclose Identities Of Each Confidential Informant Regardless Of Whether They Will

Be Called At Trial [Docket No. 231], which was joined by John Smith, Velma Williams, Charles

Gladden and Herbert Young; (4) Velma Williams' Motion For A Bill Of Particulars And

Memorandum Of Law In Support Thereof [Docket No. 237]; (5) Velma Williams' Motion For

Disclosure Of Confidential Informants, For Timely Disclosure Of *Brady/Giglio* Exculpatory

Evidence, And For Early Production Of *Jencks* Material And Memorandum Of Points And

Authorities In Support Thereof [Docket No. 239], which was joined by Joe Brown, John Smith,

Jerome Hampton, Lonnell Glover, Charles Gladden, and Herbert Young; (6) Lena Brown's

Motion For Severance And Relief From Prejudicial Joinder With Points And Authorities In

Support Thereof [Docket No. 196]; (7) Jerome Hampton's Motion To Sever Defendants (Relief

From Prejudicial Joinder Under Rule 14) [Docket No. 290]; (8) Velma Williams' Motion To

Suppress Any Evidence Der[ived] From Warrantless Searches Conducted In Violation Of The Fourth Amendment [Docket No. 242]; and (9) Lonnell Glover's Motion To Suppress Physical Evidence And Memorandum Of Points And Authorities In Support Thereof [Docket No. 252]. For the following reasons, the Court will deny the motions with the exception of Lonnell Glover's Motion To Suppress Physical Evidence And Memorandum Of Points And Authorities In Support Thereof [Docket No. 252], which will be denied in part.

## BACKGROUND

On November 8, 2007, sixteen defendants were indicted by a federal grand jury pursuant to a superceding indictment charging them with one count of conspiring to possess with the intent to distribute, and conspiring to distribute, mixtures and substances containing a detectable amount of phencyclidine ("PCP") and heroin.[1] The scope of the conspiracy allegedly extended to at least seven states and involved an additional ten co-conspirators who were charged in a separate indictment. The defendants in this case have been divided into two groups depending on whether they are accused of being involved principally in the alleged conspiracy to possess and distribute PCP or the conspiracy to possess and distribute heroin. Four of the defendants alleged to be involved in the PCP conspiracy – namely Lonnell Glover, Velma Williams, Jerome Hampton, and Lena Brown – are scheduled to be tried before a jury beginning October 20, 2008.[2] In anticipation of the trial, the defendants filed motions seeking evidentiary rulings regarding a number of issues, each of which is discussed below.

---

[1]    The indictment also charged several of the defendants with various other crimes related to the conspiracy.

[2]    The defendants allegedly involved principally in the conspiracy to possess and distribute heroin – namely John Smith, Herbert Young, Charles Gladden, Joe Brown, James Taylor, and John Washington – are slated to be tried as a group at a later date to be determined. In addition, one defendant remains a fugitive and others have entered into plea agreements.

2

**ANALYSIS**

**I.    Jerome Hampton's Motion To Dismiss The Indictment**

Jerome Hampton moves to dismiss his indictment on the ground that the grand jury's

"decision to indict . . . was infected by false information." Hampton's Mot. ¶ 11. According to

Hampton, during an initial pretrial detention hearing government counsel stated that Hampton

was observed engaging in suspicious conduct during the surveillance of an alleged drug delivery

being investigated by law enforcement agents. Hampton alleges that during a detention hearing

that took place several months later, however, government counsel retracted that claim and

conceded that it was another defendant, Henry Brown, who engaged in the suspicious conduct.

More specifically, during Hampton's initial detention hearing government counsel reportedly

claimed that during surveillance of a business parking lot where Hampton is accused of receiving

packages of PCP delivered by commercial carriers, Hampton approached a law enforcement

agent's vehicle, tried to look into the vehicle, and otherwise engaged in conduct suggesting that

he was worried about the vehicle and whether anyone was in it.[3] Hampton's Mot. ¶ 7. At the

---

[3]        Hampton claims that during the initial detention hearing government counsel
stated to the Court that:

> There was no reason on God's good earth why anybody would look into this car. It
> was doing absolutely nothing, but if you were concerned about why a car was doing
> absolutely nothing on your parking lot while you were dealing in PCP, then you'd be
> concerned about that car. And Mr. Hampton was.

> Shortly after Mr. Brown came up and put his face next to the window to try and see
> if he could discover the agent in the car, Mr. Hampton came up and drove around the
> car, looked at it, looked in and carefully studied the car to see if he could detect anyone
> in the car.

Hampton's Mot. ¶ 7. Hampton did not attach a copy of the hearing transcript, so the Court is
unable to verify whether the quote is accurate. Regardless, Hampton asserts that during the bond
review hearing that took place about seven months later, government counsel admitted "that the
earlier information was erroneous." Hampton's Mot. ¶ 8.

later detention hearing, however, government counsel asserted that it was Henry Brown – and not Hampton – who engaged in this conduct. Hampton asserts that if the grand jury was misled to believe that he tried to look into the agent's vehicle, this false information might have swayed the grand jurors to indict him. Hampton therefore seeks "to order the disclosure of all grand jury material that pertains to defendant; to conduct, if necessary, an evidentiary hearing on this; and to dismiss the indictment if it appears to the Court that such a remedy is appropriate." Hampton's Mot. ¶ 11.

The Federal Rules of Criminal Procedure provide that "[t]he court may authorize disclosure – at a time, in a manner, and subject to any other conditions that it directs – of a grand-jury matter . . . at the request of a defendant *who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury* . . . ." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added). The problem is that Hampton has not shown that a ground exists to dismiss the indictment, so there is no need for the Court to proceed further. In response to Hampton's motion, the government now contends that "it was actually both Brown and Hampton, who on separate occasions drove up to the law enforcement vehicle to determine if it was occupied by law enforcement." Govt's Br. 47. The government further proffers that "[l]aw enforcement will testify that Hampton did in fact drive up to the law enforcement vehicle and look inside the vehicle." *Id.* Because Hampton did not contest the government's assertions that both he and Henry Brown peered inside the law enforcement agent's vehicle, there is no longer any basis for concluding that the presentation of such evidence to the grand jury was "false."[4]

---

      [4]     The only basis Hampton advanced to support his contention that it was false to suggest that he looked in the law enforcement agent's vehicle was government counsel's own retraction of those asserted facts. As indicated, however, the government now proffers that anticipated trial testimony will prove that Hampton did look in the vehicle, in which case counsel's prior retraction was made in error.

Accordingly, Jerome Hampton's Motion To Dismiss Indictment [Docket No. 210] will be denied.

## II.    Lonnell Glover's Motion For Discovery Of Co-Defendant And Co-Conspirator Statements (Joined By John Smith, Velma Williams And Charles Gladden)

Lonnell Glover moved for an order mandating that the government disclose in advance of trial any co-defendant or co-conspirator statements that the government plans to admit against him.[5]  Glover's Mot. 1.  The government responded by stating that (1) it has no intention of admitting any co-defendant's custodial statements that implicate another defendant in the same trial,[6] (2) the bulk of any co-conspirator statements that might be used at trial have been disclosed during the discovery process, and (3) the only co-conspirator statements that have not been disclosed involve cooperating witnesses who are expected to testify at trial.  Govt's Br. 13-14.  Given that the government will not use co-defendant custodial statements and "the substantial portion of co-conspirator statements that the government plans to introduce at trial have already been provided in discovery on the Suggs wiretap, the Glover wiretap, and Glover truck bug,"[7] it appears that the only real issue is whether the government should be ordered to disclose those co-

---

[5]    Velma Williams also filed a Motion For A *Bourjaily* Hearing And For Disclosure Of Any Co-Conspirator Statements That The Government Intends To Rely Upon [Docket No. 245].  That motion has been reserved pursuant to the Court's September 4, 2008, order stating that "[w]ith respect to any motions seeking hearings to determine the admissibility of co-conspirator statements, it is this Court's practice to defer holding a hearing pending the United States laying the foundation necessary for the admissibility of such statements at trial."

[6]    The government stated that it "does not intend to use any statement that would raise a *Bruton* issue," which refers to the Supreme Court's decision in *Bruton v. United States*, 391 U.S. 123 (1968).  In *Bruton*, the Supreme Court held that it is reversible error to admit at trial a non-testifying co-defendant's statements that inculpate the defendant.  391 U.S. at 137.

[7]    Govt's Br. 14.

conspirator statements that were not previously disclosed during the discovery process.[8]

As the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") has concluded, courts in this jurisdiction have no authority to order the pretrial discovery of co-conspirator statements, regardless of whether the co-conspirator will testify at trial. *See United States v. Tarantino*, 846 F.2d 1384, 1417-18 (D.C. Cir. 1988) (per curiam). The D.C. Circuit has "decline[d] to extend the defendant's right to discovery beyond that required by statute or the Constitution" and neither the Jencks Act nor the Federal Rules of Evidence mandate such disclosures. *Id.* at 1418. This Court therefore has no authority to order the government to disclose co-conspirator statements and will deny the motion for that reason.

### III. Lonnell Glover's And Velma Williams' Motions To Disclose The Identities Of Confidential Informants

Lonnell Glover and Velma Williams each filed motions seeking the disclosure of confidential informants' identities.[9] Both Glover and Williams cite *Rovario v. United States*, 353

---

[8] At this juncture, it appears that any statements made by the co-defendants in this case fall into two categories: (1) custodial statements or (2) statements obtained via electronic interceptions – i.e., wiretaps – in accordance with warrants obtained pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* As indicated, the government states that it will not use any co-defendant's custodial statements that implicate a defendant in the same trial. Govt's Br. 13. As far as the wiretap statements are concerned, the Court is inclined to agree that such statements likely qualify as co-conspirator statements that may be admitted pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, assuming the government establishes by a preponderance of the evidence that "there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (quoting Fed. R. Evid. 801(d)(2)(E)). As the Court indicated in the order issued on September 4, 2008, hearings to determine the admissibility of co-conspirator statements will be deferred until trial.

[9] Williams' motion sought more than just the informants' identities; indeed, her motion enumerated 39 specific categories of information she seeks about potential informants, with many of those categories being further delineated into numerous subcategories. Williams' Mot. 10-19.

U.S. 53 (1957), and *McLawhorn v. North Carolina*, 484 F.2d 1 (4th Cir. 1973), for the

proposition that disclosure is necessary to ensure fundamental fairness and due process. Glover's

Mot. 2; Williams' Mot. 20. The government retorts that "[t]he motions should be denied because

the government's interest in protecting the safety of potential witnesses far outweighs the

defendants' interest in preparing for opening statements and cross-examinations well in advance

of trial." Govt's Br. 6. The government also takes the position that the defendants already know

the identities of cooperating informants who participated in transactions with them and *Rovario*

only applies when an informant does not testify or otherwise is unavailable to the defendant.

Govt's Br. 7. If an informant who participated in transactions with the defendants does not

testify at trial, the government promised to make that informant available on request. *Id.* The

government did not, however, identify the number of informants at issue or whether all the

informants participated in or witnessed the charged crimes.

 The so-called "informant's privilege" is well established and recognizes the government's

right to withhold the identity of confidential informants in furtherance of the public's interest in

encouraging citizens to share with law enforcement officers any knowledge they have about

crimes. *Rovario*, 353 U.S. at 59. The privilege, however, is not absolute; to the contrary,

fundamental requirements of fairness limit application of the privilege if disclosure "is relevant

and helpful to the defense of an accused, or is essential to a fair determination of a

cause . . . ." *Id.* at 60-61. The defendant bears the "heavy burden . . . to establish that the identity

of an informant is necessary to his defense" and mere speculation about an informant's role or

that an informant might prove helpful is insufficient to meet this burden. *United States v. Skeens*,

449 F.2d 1066, 1070 (D.C. Cir. 1971). As the Supreme Court has explained, there is no "fixed

rule" to determine when disclosure is "justifiable":

> The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Rovario*, 353 U.S. at 62. This Circuit generally recognizes that "[i]n order 'to overcome the public interest in the protection of the informer,' the defendant is obligated to show that the informer was 'an actual participant in or a witness to the offense charged,' whose identity is 'necessary to [the] defense.'" *See United States v. Mangum*, 100 F.3d 164, 172 (D.C. Cir. 1996) (quoting *Skeens*, 449 F.3d at 1070-71).

Glover argues that fundamental fairness warrants disclosure of informants who participated in the charged crimes, as well as those who did not, "in order to investigate bias, motives to fabricate and to cast doubt upon the credibility of certain witnesses." Glover's Mot. 2. As far as the Court can discern from Williams' motion, she asserts that disclosure of informants who participated in the charged crimes is imperative to prevent the government from having "an insurmountable strategic advantage at trial." Williams' Mot. 20. With regard to informants who were *not* participants in or witnesses of the charged crimes, none of these reasons suffices to carry the defendants' heavy burdens of establishing that the identities of the informants are "necessary" to their defenses. As indicated in *Rovario*, to assess whether disclosure is warranted the Court must take into consideration the particular circumstances of the case, including the charged crime, the defendants' possible defenses, the potential significance of the informant's testimony, and any other relevant factors. 353 U.S. at 62. Unfortunately, the defendants hampered the Court's ability to favorably consider their requests by neglecting to offer so much as a hint about what defenses the informants might help advance or the possible significance of a particular informant's testimony. *See United States v. Gaston*, 357 F.3d 77, 85 (D.C. Cir. 2004)

(rejecting a defendant's contention that it was error to deny a motion to disclose an informant's identity when the defendant's "motion did not even describe the nature of [the] defense; still less did it mention how [the defendant] expected the informant to advance her cause"). The Court, therefore, will deny the defendants' motions to the extent they seek the disclosure of informants who were not participants in or witnesses of the charged crime.

Turning to the defendants' requests to disclose the identities of informants who were participants in or witnesses of the charged crimes, the Court is inclined to agree with the government that *Rovario* and its progeny apply only when the informant does *not* testify at trial. *See United States v. Casseus*, 282 F.3d 253, 257 (3d Cir. 2002) (noting that *Rovario* "address[es] the duty of the prosecution to disclose the identity of confidential informants who will not testify"). Moreover, because the government has promised to make non-testifying informants available to the defendants upon request, the Court considers the remainder of the defendants' motions to be moot.[10] The Court presumes that the government will make non-testifying informants who were participants in the charged crimes available to defendants who so request at a time that affords the defendants a meaningful opportunity to ascertain whether these individuals have any information that is material to the defense.

---

[10]    Even if the Court construes the defendants' motions as requesting early disclosure of testifying witnesses (in this case, testifying confidential informants), it finds such disclosure unwarranted. As the D.C. Circuit long ago observed, the government has no obligation to disclose its witness list in advance of trial for noncapital cases. *See United States v. Bolden*, 514 F.2d 1301, 1312 (D.C. Cir. 1971) ("Since this was not a capital case at the time of the trial . . . there was no government duty to disclose the witness list."). Furthermore, the defendants offered no persuasive reason to order such early disclosure. The Court trusts that, pursuant to its *Brady* obligations, the government will notify Glover about known evidence of bias, motives to fabricate, or other such known evidence implicating confidential informant witness credibility. Finally, Williams' concern about preventing the government from having a litigation advantage is not, in and of itself, a reason to order early disclosure of the government's witness list.

## IV.    Velma Williams' Motion For A Bill Of Particulars

Velma Williams moves pursuant to Fed. R. Crim. P. 7(f) and the Fifth and Sixth

Amendments of the U.S. Constitution for an order compelling the government to produce a bill

of particulars addressing seven enumerated points, namely (1) the names of all co-conspirators,

whether unindicted or otherwise implicated, (2) approximate dates, times, and locations of

meetings or conversations in which each defendant participated, (3) approximate date on which

each defendant joined the conspiracy, (4) the role each defendant played in the alleged

conspiracy, (5) all overt acts in furtherance of the conspiracy, (6) the names of co-defendants

who participated in heroin distribution versus those that participated in PCP distribution, and (7)

any and all statements the co-conspirators made about Williams that the government plans to

prove at trial.  Williams' Mot. 2.  While it is axiomatic that courts are authorized to order bills of

particulars to ensure that the charges against a defendant are presented with sufficient precision

to enable the defendant to understand the charges, prepare a defense, and avoid double jeopardy

at retrial, *see United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987), it also is true that

"[t]he defendant is not entitled to notice of all the evidence the government intends to produce,

but only the theory of the government's case." *United States v. Ivy*, 83 F.3d 1266, 1281 (10th

Cir. 1996).  Accordingly, as Judge Ellen S. Huvelle observed in *United States v. Brodie*, the

government is not "required to prove how or when the conspiracy was formed, the details of any

meeting or when the defendant joined the conspiracy." 326 F. Supp. 2d 83, 91 (D.D.C. 2004)

(citing *United States v. Long*, 449 F.2d 288, 294 (8th Cir. 1971), *United States v. Hubbard*, 474

F.Supp. 64, 80-81 (D.D.C. 1979), and *United States v. Pacheco*, 902 F.Supp. 469, 474 (S.D.N.Y.

1995)).

More to the point, though, "access to discovery . . . weakens the case for a bill of

particulars here." *United States v. Urban*, 404 F.3d 754, 772 (3d Cir. 2005). Williams has received discovery not only of communications involving her, but also of communications involving the other co-defendants charged with her in the superceding indictment, in addition to other discovery provided by the government, including discovery from a related trial that took place earlier this year.[11] In addition, the Court severed the defendants into two groups for trial depending on whether the defendants were involved in the conspiracy to distribute PCP versus the conspiracy to distribute heroin. At this point in the pretrial proceedings, Williams has received enough discovery and other information, including information disclosed by the government during the numerous status conferences held by the Court, to illuminate the nature of the charges and her role in the alleged conspiracy with sufficient detail to enable her to understand the charges, prepare a defense, and avoid double jeopardy. The Court therefore will deny Williams' Motion For A Bill Of Particulars.

## V.    Jerome Hampton's And Lena Brown's Motions To Sever

Lena Brown and Jerome Hampton each move to sever their trials. Brown argues that severance is warranted because the defendants were misjoined under Fed. R. Crim. P. 8(b). Brown's Mot. ¶¶ 10-16.  In addition, both Brown and Hampton move to sever pursuant to Fed. R. Crim. P. 14(a) on the ground that the evidence against the other co-defendants is so disparate that a joint trial will unfairly prejudice them and likely cause the jury to confuse and accumulate the evidence, which ultimately will result in a "spill over" effect and the transference of guilt from the co-defendants to Brown and Hampton, respectively. Brown's Mot. ¶¶ 10-16; Hampton's Mot. ¶ 4, 7. Hampton further argues that the brevity of a trial occasioned by his severance, when balanced against the need for judicial economy, weighs in favor of granting his

---

[11]     That trial was *United States v. Suggs*, No. 07-CR-152 (ESH).

request. *Id.* ¶ 8.

After carefully considering the Indictment, the parties' arguments, and the entire record, the Court finds that joinder of Brown with the other co-defendants is proper under Rule 8(b) of the Federal Rules of Criminal Procedure, which states that:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

When assessing whether joinder is proper, "Rule 8(b) requires only that the government 'allege,' not prove, the facts necessary to sustain joinder." *United States v. Halliman*, 923 F.2d 873, 883 (D.C. Cir. 1991). Here, the Indictment and the government's alleged evidence indicate that Brown participated in the same series of acts or transactions constituting parts of a common scheme or plan to distribute PCP. *See id.* ("Acts or transactions form a 'series' within the meaning of the rule if they 'constitut[e] parts of a common scheme or plan.'" (quoting *United States v. Perry*, 731 F.2d 985, 990 (D.C.Cir. 1984))); *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984). The government proffered that it will present evidence that Lonnell Glover is a PCP and heroin distributor who stashed drugs at Brown's home. Supplement to Govt's Opp'n to Def. Lena Brown's Mot. to Sever ("Govt's Suppl.") ¶ 2. To support the allegation of Brown's involvement in the conspiracy, the government submitted transcripts of intercepted telephone calls between Brown and Glover that involve, among other things, discussions about Glover coordinating with Brown to enter and exit her home at times when she is and is not there, one of which also involves a background discussion between Glover and an alleged customer (calls 7859, 8940, 16677), a smell emanating in the home from a contained area with a door that the government alleges is the closet where Glover stored PCP in Brown's home and a conversation

during which Brown and Glover express concern about the smell given that Brown is expecting a maintenance worker to enter her home (calls 8555 & 16729), and a discussion about Glover depositing cash in an account that Brown apparently monitors (call 11626).[12]  Govt's Suppl. ¶¶ 3-11.  Considering all the evidence proffered in the case so far, the Court finds that the government has alleged facts necessary to sustain joinder, namely that Brown was involved in the conspiracy with Glover to distribute PCP and her involvement entailed allowing Glover to store PCP in her home.

More troubling is the question whether joinder unduly prejudices Brown and Hampton. Fed. R. Crim. P. 14(a) states that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  The standards that govern the Court's consideration of a motion to sever pursuant to Fed. R. Crim. P. 14(a) have been clearly demarcated by the D.C. Circuit in a number of cases, including one that involved a trial over which this Court presided, *United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) (per curiam).  Like the instant case, *Tarantino* also involved a complex conspiracy to distribute narcotics.  In that case, like this one, several defendants moved for severance and argued that severance was necessary to avoid the prejudicial "spill over" effect of damaging evidence against the other co-defendants.  As the D.C. Circuit

---

[12]      During pretrial hearings that took place on September 8, 2008, and September 9, 2008, Brown asserted for the first time that the government's transcripts misrepresent the calls involving her because they include words she never uttered.  The Court advised Brown that she could submit further briefing and the audio recordings of the calls to support her claim that the transcripts are inaccurate.  To date, however, Brown has not done so.  Even after the government filed its Supplement To The Government's Opposition To Defendant Lena Brown's Motion To Sever [Docket No. 331], which attached copies of the call transcripts, Brown did not submit a response.  There being nothing in the record to implicate the accuracy of the transcripts, the Court finds Brown's argument to be without merit.

explained:

> [W]hen the evidence against the other defendants was "far more damaging," the prejudicial spillover may have deprived a defendant of a fair trial. The trial judge is usually in the best position to evaluate the resulting degree of prejudice, and jury instructions generally are sufficient to minimize any disparities in evidence.

846 F.2d at 1398. The D.C. Circuit further noted that it has "rarely held that a district court improperly denied a motion to sever" and went on to distinguish the few cases in which it determined severance was warranted, namely: *United States v. Mardian*, 546 F.2d 973 (D.C. Cir. 1976) (noting that although the defendant's participation in the Watergate conspiracy was brief and the evidence against him slight, nevertheless "severance was not required until [the defendant's] lawyer became ill during trial") and *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) (holding that a defendant who was charged with misprision of a felony and making false statements, but not the conspiracy and murder charged against his co-defendants, was prejudiced by the quantity and inflammatory nature of the testimony about his co-defendants' crimes, which created "a false impression" that the defendant was involved in the conspiracy and murder). Indeed, in a different case, *United States v. Manner*, 887 F.2d 317 (D.C. Cir. 1989), the D.C. Circuit emphasized that "[t]he few cases in which we have overturned a trial court's denial of a motion to sever have involved clear disparities between the weight, quantity, or type of the evidence against the movant and against the other defendants." 887 F.2d at 325.

The D.C. Circuit also has indicated that it is proper to deny severance when the prosecution of the defendant seeking severance requires presentation of much of the same evidence, testimony of the same witnesses, and involves defendants charged with participating in the same illegal acts. *United States v. Sutton*, 801 F.2d 1346, 1365 (D.C. Cir. 1986). These standards derive from general policies favoring the joint trial of defendants who have been indicted together because joinder expedites the administration of justice, reduces the congestion

14

of trial dockets, conserves judicial time, lessens the burdens on citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who otherwise would be called upon to testify only once. *See United States v. Leonard*, 494 F.2d 955, 965 (D.C. Cir. 1974).

The Court is mindful that "[m]otions for severance are particularly sensitive in conspiracy cases because of the danger that the guilt of one defendant may be unjustly transferred to another." *United States v. Sutton*, 801 F.2d 1346, 1363-64 (D.C. Cir. 1986). At this stage, however, and admittedly with some reservation given the sparse amount of evidence the government has proffered to implicate Brown and Hampton, the Court finds that it cannot conclude severance is warranted pursuant to Fed. R. Crim. P. 14(a). Although the Court is not unsympathetic to Brown's and Hampton's concerns, the pretrial nature of their challenges to joinder are somewhat problematic simply because the charges against them allege a conspiracy involving several defendants – many of whom, like Brown and Hampton, are alleged to have distinct roles and differing degrees of involvement – and the precise scope of admissible evidence against them has not yet crystallized. Additionally, from this vantage point, the comparative differences between the evidence alleged against Brown and Hampton do not appear to be so easily confused that limiting instructions will fail to insulate them from undue prejudice. The communications and transactions involving Brown and Hampton are distinct enough that jurors should be able to compartmentalize them, and limiting instructions should be sufficient to ensure that happens. Moreover, unlike the defendant in *Sampol*, who was charged with crimes different from the more serious crimes charged against his co-defendants, Brown and Hampton are charged with the same conspiracy crime as the other co-defendants in the instant case. It accordingly appears that, at a minimum, the trial will involve testimony of the same witnesses

15

and co-defendants charged with participating in the same illegal acts. The Court therefore will

deny severance at this time, with the caveat that Brown and Hampton may raise the issue again if

it appears during the trial that they are prejudiced by joinder.

**VI.**     **Velma Williams' Motion To Suppress Any Evidence Derived From Warrantless Searches Conducted In Violation Of The Fourth Amendment**

Velma Williams moves to suppress "any and all evidence derived as a result of a

warrantless search" of her residence in St. Louis, Missouri, and any other defendant's property

for which she has standing. Williams' Mot. 1. At the time she filed her motion, the government

was contending that a valid search warranted existed but it was in the process of obtaining a copy

of the warrant from law enforcement agents in St. Louis. Govt's Omnibus Resp. to Def.'s

Pretrial Mots. 35. At a later status conference, however, the government stated that it had

provided a copy of the search warrant to Williams. To date, Williams has raised no specific

challenge with regard to the copy of the search warrant she received from the government, so the

Court deems the issue moot and will deny the motion for that reason.

**VII.**     **Lonnell Glover's Motion To Suppress Physical Evidence**

Lonnell Glover moves to suppress all physical evidence seized during a warrantless

search of a home located at 9002 Old Palmer Road, Ft. Washington, Maryland, on the ground

that law enforcement agents unlawfully obtained consent from a co-owner of the home,

Gwendolyn Madison. Glover's Mot. 8. Glover cites *Georgia v. Randolph*, 547 U.S. 103 (2006),

for the proposition that "'a physically present co-occupant's stated refusal to permit entry

prevails, rendering the warrantless search unreasonable and invalid as to him.'" Glover's Mot. 8.

Glover also argues that "whatever consent [Madison] gave was not valid because it was under the

duress of armed tactical search teams in the house . . . ." *Id.* Finally, Glover posits that the

search was unlawful "because the request to search was for evidence of crime and the agents

exceeded the scope of the consent by seizing boxes of documents."[13] *Id.*

On September 8, 2008, the Court held an evidentiary hearing regarding Glover's claims during which the arresting law enforcement agent testified and was cross-examined by Glover's counsel.[14] The agent testified that he and three other agents were directed to the home at 9002 Old Palmer Road to arrest Glover. The agent said that he knocked on the home's door and Glover answered. According to the agent, Glover was handcuffed immediately and taken inside the home to his living room so agents could retrieve additional clothing for him. The agent said that, as they approached the living room, Madison was coming down a staircase in the home. The agent further testified that, after getting clothing for Glover, Glover was taken out of the home and placed in an official vehicle. The agent stated that he never asked Glover whether he could search the home and Glover never voiced any objection to doing so.

The agent further testified that, at some point, Madison said she lived at the home[15] and was asked whether she would consent to a search of the areas Glover frequented. The agent said

---

[13]     Glover also raised the additional argument that the search of the home at 9002 Old Palmer Road was a fruit of the illegal interception of his telephone therefore any evidence seized as a result of the search must be suppressed. Glover's Mot. 4. The Court reserves judgment with regard to this argument pending a decision about the lawfulness of the electronic surveillance conducted in this case.

[14]     During that same evidentiary hearing Glover withdrew the argument that federal agents searched several other properties based on expired warrants after the government provided late discovery of valid warrants dated June 15, 2007. *See* Glover's Mot. 2-4. He also withdrew the arguments that the search at 9002 Old Palmer Road was not a valid search incident to arrest and was not a lawful protective sweep after it became clear that the government was asserting neither of these bases to justify the search. *See* Govt's Omnibus Resp. to Def.'s Pretrial Mots. 27 n.2 (stating that "law enforcement officials relied upon the consent of an owner and occupant of the premises in conducting the search, making a review of the sufficiency of these alternate theories unnecessary").

[15]     The Court admitted into evidence two documents that it found established that Glover and Madison were joint owners of the home at 9002 Old Palmer Road.

Madison agreed to permit a search and signed a handwritten consent form, a copy of which was admitted into evidence by the Court. The agent said Madison appeared to be in her mid-forties, educated, not under the influence of drugs or alcohol, and there were no indications that she had any difficulty understanding the consent form, which was drafted by another agent and signed by her. The agent testified that no law enforcement officials had weapons drawn while they were in Madison's presence. He also said that Madison accompanied him to a bedroom that Glover and Madison appeared to share and she waited in the doorway while four boxes of documents were seized. The agent stated that Madison never indicated that she wanted to withdraw her consent or otherwise limit the scope of the search.

Although Glover's counsel cross-examined the agent, no witness testimony or other evidence was submitted to support Glover's claim that, before obtaining consent from Madison, Glover objected to a search of his home. To be fair, Glover indicated that he wanted to testify but, after a discussion between his counsel and the government, counsel stated that he would like an opportunity to review some documents in the government's possession before calling Glover as a witness. The Court therefore continued the evidentiary hearing for several days to permit counsel time to review the documents. Counsel later notified the Court and the government that he did not anticipate presenting anymore evidence and would rest on the arguments already submitted to the Court.

As the Supreme Court has made clear, "[i]t is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically

established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and 'voluntariness is a question of fact to be determined from all the circumstances.'" *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Bustamonte*, 412 U.S. at 227. It has long been the rule, however, that a prosecutor relying on consent to justify a search bears the burden of proving that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Such proof must be by a preponderance of the evidence. *United States v. Taylor*, 31 F.3d 459, 463 (7th Cir. 1994). To meet this burden, the government "is not limited to proof that consent was given by the defendant"; to the contrary, the government "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974).

At issue is whether the voluntary consent of a third-party occupant at a premises will supplant a defendant's objections to a search without a warrant. The resolution of this question is governed by the Supreme Court's decision in *Randolph*, which held that a co-occupant's voluntary consent could <u>not</u> prevail over a present and objecting occupant's refusal to permit a warrantless search. 547 U.S. at 122-23. In *Randolph*, the Supreme Court concluded that the central values protected by the Fourth Amendment are not outweighed by a co-occupant's conflicting permission to allow a warrantless search.[16] *Id.* at 116. As the Supreme Court

---

[16]    In *Randolph*, police responded to a wife's complaint that her husband had taken their child. 547 U.S. at 107. After arriving at the couple's home, the wife told one of the officers that her husband was using drugs and there was drug evidence in the house. *Id.* An officer asked the husband for permission to search the house, which the husband "unequivocally refused." *Id.* The officer then proceeded to ask the wife for consent, "which she readily gave." *Id.* The wife led the officer to an upstairs bedroom where the officer saw a drinking straw with a powdery residue he suspected was cocaine. *Id.* The officer seized the straw and a later search after

observed, "nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident's objection." *Id.* at 120. The Supreme Court therefore held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 122-23. The opinion indicates, however, that the police need not make inquiries to a present defendant to determine whether he objects to the search if a co-occupant consents. As the Supreme Court explained, "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.* at 121.

It is clear based on the Supreme Court's decision in *Randolph* that, if in fact Glover objected to a warrantless search at 9002 Old Palmer Road before law enforcement agents sought Madison's consent, the search would be unlawful. As mentioned previously, though, the defendant has proffered nothing to support his claim that he objected to the search at such a time and in such a way as to implicate *Randolph*. The only evidence admitted for the Court's consideration are documents showing that Madison and Glover are co-owners of the home at 9002 Old Palmer Road and the testimony of a law enforcement agent who stated with credibility that Glover was never asked for consent to search the home and otherwise never voiced an objection to a search.

As far as Glover's assertion that Madison was coerced, there is no evidence that she "was

---

obtaining a search warrant resulted in further drug evidence that was used to indict the defendant. *Id.* The defendant "moved to suppress the evidence, as products of a warrantless search of his house unauthorized by his wife's consent over his express refusal." *Id.*

under the duress of armed tactical search teams in the house . . . ." Glover's Mot. 8. As the

government correctly noted, the coerciveness of being confronted by a uniformed officer was

addressed by the Supreme Court in *United States v. Drayton*, 536 U.S. 194 (2002). In *Drayton*,

the Supreme Court considered whether law enforcement officers conducting drug interdiction

efforts on buses must advise bus passengers during these encounters of their right not to

cooperate before a consent to search baggage can be deemed voluntary. 536 U.S. at 197. The

case involved two defendants traveling on a bus who consented to have their bag searched and

their bodies patted down after being confronted by a law enforcement officer who showed them a

badge and asked for consent to conduct the searches. Both defendants ultimately were arrested

when the officer detected drug packages on their bodies during the pat down. Declining to hold

that voluntary consent must be premised on officials advising passengers that they can refuse to

give consent, the Supreme Court also rejected the defendants claim that they felt coerced by the

fact that the officer displayed a badge:

> Officers are often required to wear uniforms and in many circumstances this is cause
> for assurance, not discomfort. Much the same can be said for wearing sidearms.
> That most law enforcement officers are armed is a fact well known to the public. The
> presence of a holstered firearm thus is unlikely to contribute to the coerciveness of
> the encounter absent active brandishing of the weapon.

*Id.* at 204-205. As indicated above, however, the law enforcement agent testified that no

weapons were drawn in Madison's presence and there is no other evidence to suggest that

coercive measures were used to secure her consent. In light of the Supreme Court's decision in

*Drayton*, there simply is no basis for this Court to conclude that Madison's consent was the

product of coercion merely because the officers at issue wore tactical gear.

Glover's final contention is that law enforcement officers exceeded the scope of

Madison's consent by seizing boxes containing documents. Glover's Mot. 8. The Supreme

21

Court has stated that "[t]he scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citing *United States v. Ross*, 456 U.S. 798 (1982) (noting that the defendant did not place any explicit limit on his consent to search his car so the police officer reasonably understood that consent to include searching a folded paper bag in the car that contained drugs)). The D.C. Circuit has further explained that "[t]he scope of the consent is measured by a test of 'objective reasonableness': it depends on how broadly a reasonable observer would have interpreted the consent under the circumstances." *United States v. Rodney*, 956 F.2d 295, 297 (D.C. Cir. 1992).

Glover offers no facts to back up his assertion that seizing the boxes of documents was outside the scope of Madison's consent by, for example, proffering evidence that the boxes were located in an area Madison prohibited officers from searching, *see United States v. Springs*, 936 F.2d 1330, 1334 (D.C. Cir. 1991) (indicating that an individual may limit the scope of consent to certain areas, but in the absence of any such limitation the scope of consent would reasonably be understood to extend to the object of the search), or by demonstrating that the boxes were located in an area that was not a common area Madison and Glover shared, *see United States v. Harrison*, 679 F.2d 942, 947 (D.C. Cir. 1982) (refusing to suppress boxes of marijuana that were in a basement storage area over which the consenting individual had common authority). To the contrary, the evidence shows that the boxes of records were located in a bedroom of a home that Glover shared with Madison and there is no evidence that Madison limited her consent to search by excluding that room. Consequently, absent other evidence indicating that Madison expressly limited the scope of her consent, or that the boxes were found in an area over which she did not exercise common authority, a reasonable observer would have understood the scope of Madison's consent to be defined by the government's search for evidence of illegal narcotics

activities, which included documentary evidence found in boxes where drugs, drug

paraphernalia, or documents relating to drug activities might be stored.

The Court therefore finds that, considering the totality of the circumstances, the

government has met its burden of proving by a preponderance of the evidence that Madison

freely and voluntarily consented to the search of the home at 9002 Old Palmer Road, over which

she possessed common authority. The Court further finds that the search did not exceed the

scope of the consent because, under the circumstances, a reasonable observer would have

concluded that the consent to search the home included consent to search the bedroom Madison

shared with Glover, particularly since the law enforcement agent testified that authorities

requested consent to search areas of the home that Glover frequented.

## CONCLUSION

For the reasons set forth above, the Court will deny (1) Jerome Hampton's Motion To

Dismiss Indictment [Docket No. 210]; (2) Lonnell Glover's Motion For Discovery Of Co-

Defendant And Co-Conspirator Statements [Docket No. 228], which was joined by John Smith,

Velma Williams and Charles Gladden; (3) Lonnell Glover's Motion To Disclose Identities Of

Each Confidential Informant Regardless Of Whether They Will Be Called At Trial [Docket No.

231], which was joined by John Smith, Velma Williams, Charles Gladden and Herbert Young;

(4) Velma Williams' Motion For A Bill Of Particulars And Memorandum Of Law In Support

Thereof [Docket No. 237]; (5) Velma Williams' Motion For Disclosure Of Confidential

Informants, For Timely Disclosure Of *Brady/Giglio* Exculpatory Evidence, And For Early

Production Of *Jencks* Material And Memorandum Of Points And Authorities In Support Thereof

[Docket No. 239], which was joined by Joe Brown, John Smith, Jerome Hampton, Lonnell

Glover, Charles Gladden, and Herbert Young; (6) Lena Brown's Motion For Severance And

Relief From Prejudicial Joinder With Points And Authorities In Support Thereof [Docket No. 196]; (7) Jerome Hampton's Motion To Sever Defendants (Relief From Prejudicial Joinder Under Rule 14) [Docket No. 290]; and (8) Velma Williams' Motion To Suppress Any Evidence Der[ived] From Warrantless Searches Conducted In Violation Of The Fourth Amendment [Docket No. 242].  The Court also will deny in part Lonnell Glover's Motion To Suppress Physical Evidence And Memorandum Of Points And Authorities In Support Thereof [Docket No. 252].  An appropriate Order will accompany this Memorandum Opinion.

October 3rd, 2008

_____
Thomas F. Hogan
United States District Judge

24