## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No.  07-153 (TFH) |
| LONNELL G. GLOVER, et al., | |
| Defendants. | |

## MEMORANDUM OPINION

Pending before the Court are (1) Defendant Lonnell Glover's Motion To Suppress Evidence Obtained From Interception Of Wire Communications And Seizure Of Electronic Communications [Docket No. 232] and (2) Defendant Lonnell Glover's Motion To Suppress Evidence Obtained From Interceptions Of Communications In And Within The Vicinity Of A 1998 Chevrolet Pickup Truck, District Of Columbia Registration BZ0597 [Docket No. 293]. The Court will deny both motions for the reasons that follow.

## BACKGROUND

On November 8, 2007, Lonnell Glover and fifteen co-defendants were indicted by a federal grand jury pursuant to a superceding indictment that charges them with one count of conspiring to distribute and possess with the intent to distribute mixtures and substances containing one kilogram or more of phencyclidine ("PCP") and heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iv), 841(b)(1)(A)(I), and 846.[1]  In addition, ten individuals were

---

[1]     The indictment also contains a forfeiture allegation according to which Glover "shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any property constituting, or derived from proceeds obtained directly or indirectly, as a result of the said violation and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violation . . . ."  Indictment, Forfeiture Allegation ¶ 2.

named as unindicted co-conspirators, one of whom, Anthony Suggs, was the focus of the original

criminal investigation into the distribution of PCP in the Washington, D.C., area.  Glover became

ensnared in the criminal investigation after the interception of communications from Suggs's

mobile phone revealed that Glover likely was supplying PCP to Suggs.

     The bulk of the evidence law enforcement agents obtained while investigating the case

against Glover and his co-defendants consisted of electronic surveillance conducted in

accordance with a number of court orders Judge Rosemary Collyer issued.  The court orders

authorized the government to intercept communications from several mobile phones, including

Glover's personal mobile phone (the "mobile phone wiretap")[2] and a mobile phone the

government secretly installed in his pickup truck (the "truck bug").[3]  According to the

government, the court-authorized electronic surveillance resulted in the interception of 21,183

communications.  Govt's Resp. to Defs.' Several Mots. to Suppress the Results of Court Ordered

Electronic Surveillance ("Govt's Resp. Br.") 4.  Glover now moves to suppress the contents of

communications intercepted from his mobile phone and the truck bug, as well as any evidence

derived from the intercepted communications, based primarily on asserted flaws in the affidavits

the government submitted to support its applications for court orders permitting electronic

surveillance.

---

     [2]     Glover's mobile telephone is identified in court filings by the number (202) 276-4337.  Def. Lonnell Glover's Mot. to Suppress Evid. Obtained from Interception of Wire Communications and Seizure of Electronic Communications ("Glover's Phone Suppression Mot.") 2.

     [3]     The same criminal investigation that resulted in the superceding indictment in this case also led to the superceding indictment of five other individuals in a separate but related case, *United States v. Suggs*, No. 07-CR-152 (ESH).  The defendants in the *Suggs* case, including lead defendant Anthony Suggs, were named as unindicted co-conspirators in the instant case.  Judge Collyer's orders also authorized the government to intercept communications from Anthony Suggs's mobile telephone.

**ANALYSIS**

The legal standards that govern an application for a court order authorizing the

interception of wire, oral, or electronic communications are defined by statute:

> Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §
> 2510 *et seq.*, authorizes the district court to approve an application for the
> interception of certain wire, oral, or electronic communications. 18 U.S.C. § 2518.
> The wiretap statute requires that an application for a wiretap shall be in writing, under
> oath, and shall contain certain information including "a full and complete statement
> of the facts and circumstances relied upon by the applicant[ ] to justify his belief that
> an order should be issued." *Id.* § 2518(1). On the basis of the facts submitted by the
> applicant, the district court may authorize a wiretap upon finding that (1) probable
> cause exists to believe that an individual has committed or is about to commit one of
> certain enumerated offenses; (2) probable cause exists to believe that "particular
> communications concerning that offense will be obtained" through an interception;
> (3) "normal investigative procedures have been tried and have failed or reasonably
> appear to be unlikely to succeed if tried"; and (4) probable cause exists to believe that
> the communication facility sought to be wiretapped "[is] being used, or [is] about to
> be used, in connection with the commission of [the] offense." *Id.* § 2518(3)(a-d); see
> *United States v. Donovan*, 429 U.S. 413, 435, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).
> The determination that "normal investigative procedures have been tried and have
> failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous,"
> 18 U.S.C. § 2518(3)(c), is referred to as the "necessity requirement," and it is the
> "keystone of congressional regulation of electronic eavesdropping." *United States v.
> Williams*, 580 F.2d 578, 587-588 (D.C.Cir.1978).
>
> The wiretapping statute also requires that "[e]very [wiretap] order and extension
> thereof shall contain a provision that the authorization to intercept shall be executed
> as soon as practicable [and] shall be conducted in such a way as to minimize the
> interception of communications not otherwise subject to interception ...." 18 U.S.C.
> § 2518(5). This is referred to as the "minimization requirement." Although "[t]he
> statute does not forbid the interception of all nonrelevant conversations," the
> government must make reasonable efforts to "minimize" the interception of such
> conversations. *Scott v. United States*, 436 U.S. 128, 139-40, 98 S.Ct. 1717, 56
> L.Ed.2d 168 (1978). The statute also provides that an order authorizing an
> interception cannot extend "for any period longer than is necessary to achieve the
> objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. §
> 2518(5).
>
> The wiretap statute provides that "no part of the contents of [intercepted]
> communication and no evidence derived therefrom may be received in evidence in
> any trial, hearing, or other proceeding . . . if the disclosure of that information would
> be in violation of this chapter." *Id.* § 2515. The "aggrieved person" may move to
> suppress the introduction of wiretap evidence or its fruits if "the communication was

unlawfully intercepted," the "order of authorization or approval under which it was intercepted is insufficient on its face," or if "the interception was not made in conformity with the order of authorization or approval." *Id.* § 2518(10)(a)(i-iii); *see Donovan*, 429 U.S. at 433-34, 97 S.Ct. 658.

*United States v. Carter*, 449 F.3d 1287, 1292-93 (D.C. Cir. 2006).

Glover contends that the court orders authorizing the mobile phone wiretap and truck bug were issued in error because the government's applications for the orders failed to meet the statutory requirements. With regard to the application for the mobile phone wiretap, Glover argues that Special Agent Ryan Pardee's supporting affidavit[4] was defective because it (1) failed to establish probable cause, (2) contained misleading statements, and (3) failed to demonstrate the necessity for electronic surveillance. Glover also challenges the interception of communications from his mobile phone on the ground that the government failed to comply with the statute's minimization requirement.[5] Glover's Phone Suppression Mot. 4-18.

As far as the truck bug is concerned, Glover complains that the truck bug application failed to meet the statutory requirements because Special Agent Pardee's affidavit did not "establish the necessity to take the extreme measure of placing a listening device within the private space of the interior of Glover's truck." Def. Lonnell Glover's Mot. to Suppress Evid. Obtained from Interception of Communications In and Within the Vicinity of a 1998 Chevrolet Pickup Truck, District of Columbia Registration BZ0597 3-8 ("Glover's Truck Bug Suppression Mot."). Glover further insists that the court's order permitting the truck bug "was too far

---

[4]     Special Agent Pardee was involved in the criminal investigation that ultimately led to Glover's indictment and summarized in affidavits the facts alleged to warrant the interception of communications from Glover's personal mobile phone and a mobile phone the government installed in Glover's truck.

[5]     Glover "seeks to adopt and conform to the arguments made by Suggs's counsel in ECF Document 88, filed November 19, 2007, which set forth Suggs's arguments relating to minimization." Glover's Phone Suppression Mot. 18.

sweeping" and did not adequately limit law enforcement agents' authority to seize and enter the truck. *Id.* at 6.

## I.     Probable Cause to Intercept Communications from Glover's Mobile Phone

To determine whether probable cause exists for a wiretap courts apply the same legal standards used to determine whether probable cause exists for a search warrant. *See, e.g., United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999). Accordingly, a federal judge evaluating a wiretap application to determine whether it demonstrates probable cause must "simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that . . . evidence of a crime" will be obtained by the interception of wire, oral, or electronic communications. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "While each fact standing alone may be insufficient, the combination of all the facts can establish probable cause . . . and certain conduct that may appear 'innocent to a lay person may have entirely different significance to an experienced [law enforcement] officer.'" *United States v. Gilliam*, 167 F.3d 628, 633 (D.C. Cir. 1999) (quoting *United States v. Catlett*, 97 F.3d 565, 573-74 (D.C. Cir. 1996)). It is the duty of a reviewing court "to ensure that the [judge issuing the wiretap order] had a substantial basis for . . . conclud[ing] that probable cause existed." *Gates*, 462 U.S. at 238-39 (internal quotation marks omitted).

Glover asserts that Special Agent Pardee's affidavit, which was submitted in support of the mobile phone wiretap application, fails to demonstrate probable cause because there is no mention of Glover's name in paragraphs 18, 19, 21, 22, 23, 25 and 34. Glover's Phone Suppression Mot. 5-6. According to Glover, the absence of his name from these paragraphs indicates that Special Agent Pardee "relie[d] on the activities of others . . . to attempt to bootstrap

[a] probable cause determination for Glover." *Id.* at 6.  As an initial matter, Glover is incorrect

that his name is not mentioned in paragraph 23 of Special Agent Pardee's affidavit, which is

titled "Parker Attempted Drug Sale" and describes a cooperating witness's attempt to make a

controlled purchase of narcotics from an intermediary named James Parker who allegedly was

involved in criminal activities with Anthony Suggs.  The events described in paragraph 23

include multiple references to phone calls between Suggs and Glover.  *Id.* at Ex. A ¶ 23.

   More to the point, though, Glover's approach of cherry picking paragraphs that omit his

name does not make out a viable claim that Special Agent Pardee's affidavit wholly fails to

demonstrate probable cause.  On more than one occasion the United States Supreme Court has

emphasized that the determination of probable cause cannot be made by viewing relevant facts in

isolation.  *See, e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 372 n.2 (2003) (noting that a court was

"mistaken" in its approach of considering a fact "in isolation, rather than as a factor in the totality

of the circumstances"); *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (per curiam) (finding

that a state supreme court erred by "judging bits and pieces of information in isolation" and

thereby failing to consider a law enforcement officer's affidavit in its entirety).  Indeed, it is

axiomatic that "[i]n determining the existence of . . . probable cause, we do not isolate each

factor of suspicion, but instead look to the totality of the circumstances." *United States v.*

*Saucedo-Munoz*, 307 F.3d 344, 351 (5th Cir. 2002).  Considering Special Agent Pardee's

affidavit as a whole, and the totality of the circumstances, the Court is persuaded that Judge

Collyer had a substantial basis to conclude that probable cause existed.

   Special Agent Pardee's affidavit reveals that federal law enforcement agents were

investigating PCP traffickers operating in the District of Columbia for more than a year before

requesting a wiretap of Glover's personal mobile phone.  Glover's Phone Suppression Mot. Ex.

A ¶ 4.  It appears that the investigation originally focused on Anthony Suggs based on a cooperating witness's information that Suggs "was distributing large quantities of cocaine and PCP in the Washington, D.C., area." *Id.* ¶ 20.  On August 23, 2006, at the direction of law enforcement agents, the cooperating witness engaged in a controlled purchase of PCP from Suggs. *Id.* ¶ 24.  On November 14, 2006, the same cooperating witness engaged in a controlled purchase of cocaine from Suggs. *Id.* ¶ 25.

Nearly two months later, on January 4, 2007, Suggs was further implicated in the narcotics investigation when a second cooperating witness engaged in a controlled purchase of PCP from James Parker who, after agreeing to the sale, was observed getting into a vehicle that belonged to Suggs.  Immediately after exiting Suggs's vehicle, Parker returned to the second cooperating witness and provided him with eight ounces of PCP. *Id.* ¶ 22.  In addition, pen register data reportedly showed that, throughout the duration of the transaction between the second cooperating witness and Parker, Parker "made or received a total of 15 telephone calls involving Anthony Suggs." *Id.*

Four days later, on January 8, 2007, Judge Collyer issued an order authorizing law enforcement agents to intercept calls from Suggs's mobile phone. *Id.* ¶ 26.  Law enforcement agents implemented the order on January 9, 2007. *Id.*  Less than 24 hours after implementing the order, on January 10, 2007, law enforcement agents intercepted the first series of calls involving Glover. *Id.* ¶ 28.  Earlier that day, Suggs received a call from an individual named Julian Johnson and engaged in a coded conversation that the Special Agent described and interpreted to mean that Suggs intended to meet with his supplier to determine the quantity of PCP Johnson wanted. *Id.* ¶ 27.  Johnson reportedly told Suggs that he wanted the same quantity that he previously received and indicated that, although he would like more, he had no place to store a

larger quantity. *Id.*

Three minutes after talking to Johnson, Suggs called Glover but Glover said he had

people at his house so he was unable to "do no moving around right now" and would call Suggs

back. *Id.* ¶ 28. Later, Suggs received a call from Johnson and told him that they could meet the

following day. *Id.*      On the following day, Suggs called Glover and left a message saying that

he was waiting for Glover. *Id.* ¶ 29. Glover returned the call and said he would be there in five

minutes. *Id.* The Special Agent attested that he interpreted this conversation to mean that Suggs

and Glover were "coordinating a meeting to discuss their illegal narcotics trafficking business."

*Id.*

Three days later, on January 14, 2007, Suggs called Glover again and said he needed to

see Glover whenever Glover was ready. *Id.* ¶ 30. Suggs and Glover then engaged in several

more calls to discuss the time and street location where they were meeting. *Id.* As the time for

the meeting approached, Glover called Suggs and said he was five minutes away, to which Suggs

responded "I'm sitting right here." *Id.*

Four days later, on January 18, 2007, Suggs called Glover and was told to wait until later

that afternoon. *Id.* ¶ 30. Almost two hours later, Glover called Suggs and they agreed to meet.

*Id.* During a subsequent call between Glover and Suggs they set a time to meet. *Id.* Law

enforcement agents conducted a "spot check" around the time and location where Glover and

Suggs were meeting and observed Glover's truck parked in front of Suggs's truck on a street. *Id.*

The next morning, January 19, 2007, Suggs called Glover and they agreed to meet again

the following day when Suggs finished working. *Id.* ¶ 32. The same day, the cooperating

witness who previously purchased PCP directly from Suggs was directed by law enforcement

agents to try to attempt another purchase. *Id.* ¶ 34. Because Suggs did not answer the

cooperating witness's calls, law enforcement agents sent the cooperating witness into the neighborhood where Suggs's grandmother lives. *Id.* Suggs returned the cooperating witness's calls and they met, but Suggs "put [the cooperating witness] off when [he] asked to purchase drugs." *Id.*

The following day, January 20, 2007, Suggs called Glover and Glover said he was on his way to a Home Depot so they agreed to meet there. *Id.* Approximately 20 minutes later, law enforcement agents observed Suggs's truck in the Home Depot parking lot and, when the truck pulled out, law enforcement agents saw Glover walking away from the truck. *Id.* ¶ 35.

Almost immediately after leaving the Home Depot parking lot, Suggs called the cooperating witness. *Id.* When the cooperating witness returned Suggs's call at the direction of law enforcement agents, he arranged to meet with Suggs at a nearby location where the cooperating witness executed another controlled purchase of PCP from Suggs. *Id.*

The next day, January 21, 2007, Suggs and Glover arranged to meet again and engaged in several calls to confirm the location of their meeting. *Id.* ¶ 36. Two days later, on January 23, 2007, Suggs and Johnson exchanged telephone calls that the Special Agent described and interpreted to mean that Suggs expected to be supplied with drugs the following weekend and that the source of supply was outside the Washington, D.C., metropolitan area. *Id.* ¶ 33.

That Friday, January 26, 2007, law enforcement agents intercepted Suggs calling Glover and saying that "he needs to 'rap' with Glover." *Id.* ¶ 23. Suggs then immediately called Parker and Parker said he would "hollar" at Suggs later. *Id.* At the direction of law enforcement agents, the second cooperating witness called Parker to try to arrange another controlled purchase of PCP. *Id.* Parker told the cooperating witness he would call back later. *Id.* Several hours later, the cooperating witness called Parker again but Parker said he "was still waiting for his car to be

9

returned to him." *Id.*

An hour and a half later, Suggs and Glover arranged a meeting to take place the following morning. *Id.* The next morning, Saturday, Glover and Suggs had a telephone conversation during which Suggs told Glover he would call "when he got in town." *Id.* In the afternoon, Suggs called Parker and they agreed to meet later that day. *Id.* In the meantime, Glover and Suggs engaged in multiple calls back and forth trying to arrange to meet. *Id.* They ultimately agreed to meet in Washington, D.C., and Glover told Suggs that he was at the corner of 12th and G Streets. *Id.* Law enforcement agents observed Suggs's truck at that intersection shortly thereafter. *Id.* About half an hour later, Suggs talked to Johnson and told Johnson that "the tickets" had not come in yet but he just met with "his little partner" about them. *Id.* A little over two hours later, Suggs and Parker agreed to meet at a prearranged location. *Id.*

The foregoing summary of many of the facts[6] contained in Special Agent Pardee's affidavit undermine Glover's contention that the omission of his name from paragraphs 18, 19, 21, 22, 23, 25 and 34 somehow diminishes the suspiciousness of the conversations and events that involve him. Admittedly, the significance and timing of Glover's involvement would be much more obvious if the facts in the affidavit were presented in a more consistent chronological order – when placed in chronological order as the Court did above, it becomes clear that the paragraphs Glover cited involve what fairly could be described as the background events that occurred before the government secured authorization to intercept communications from Suggs's

---

[6]     The Court's summary is not exhaustive of all the facts contained in Special Agent Pardee's affidavit, which was 45 pages long and consisted of 65 numbered paragraphs. In addition, the Court omitted many portions of the affidavit that contained Special Agent Pardee's interpretation of the described events. The Court's summary merely highlights some of the most relevant paragraphs and places them in chronological order for clarity. That being said, the Court considered the affidavit in its entirety to arrive at a conclusion about whether it established probable cause.

mobile phone.  Once law enforcement agents began intercepting communications from Suggs's

mobile phone, Glover entered the picture.  The cited paragraphs simply describe the groundwork

of the investigation and the evidence demonstrating Suggs's role as a distributor of narcotics, as

well as the bases for intercepting calls from his mobile phone to try to ascertain the scope of his

criminal activities and the source of his narcotics supply.  Once the government began

interceptions, Suggs's conversations with Glover, as well as law enforcement agents'

observations and other investigative methods, evidenced a probability that Glover was involved

in Suggs's criminal activities, as described in the other paragraphs of the affidavit that Glover did

not challenge.  Furthermore, Glover cited no authority for the proposition that each paragraph of

an affidavit supporting an application for a wiretap must identify the target of the proposed

wiretap, or even that a proportional majority of the paragraphs must do so.  For obvious reasons

such a legal standard would be illogical and impractical.

The Court concludes that the totality of the circumstances set forth in Special Agent

Pardee's affidavit demonstrate that there is a fair probability that evidence of a crime would be

obtained by the interception of communications from Glover's personal mobile phone.  Even

when stripped of most of the Special Agent's interpretations, the affidavit reveals that Suggs is

involved in the distribution of narcotics, as demonstrated by the cooperating witnesses'

controlled purchases involving Suggs and Parker, and the nature and circumstances of the

conversations intercepted from Suggs's phone.  Commonsense dictates that, given all the

circumstances, it is more than mere coincidence that Suggs engages in numerous calls and

meetings with Glover, on streets and in a parking lot, that coincide with narcotics transactions he

sets up with a cooperating witness, Parker and Johnson.  Although the conversations with

Johnson are less patent, the conversations and events involving the cooperating witness and

Parker are undoubtedly suspect, particularly in light of the facts and circumstances surrounding

the cooperating witnesses' controlled narcotics purchases involving both Parker and Suggs.

Once the Special Agent's analyses and interpretations are factored into the consideration, the

probability that a wiretap will reveal evidence of a crime becomes that much more apparent.[7]

Applying a practical, commonsense analysis to the totality of the circumstances, the Court

concludes that Judge Collyer had a substantial basis to determine that there was probable cause to

believe a wiretap of Glover's personal mobile phone would disclose evidence of a crime.

## II.    Veracity of the Wiretap Affidavit

Glover also challenges Special Agent Pardee's affidavit on the ground that it contains

"conclusory, false, reckless and misleading statements . . . ."  Glover's Phone Suppression Mot.

7.  Glover challenges the following statements:

> Paragraph 28:  "Based upon my training and experience in this and other narcotics
> investigations, your affiant understands that in these conversations
> GLOVER is utilizing the target telephone to facilitate his ongoing
> narcotics trafficking activity."

> Paragraph 29:  "Based upon my training and experience in this investigation your
> affiant understands from this series of conversations that SUGGS and
> GLOVER are coordinating a meeting to discuss their illegal narcotics

---

[7]    As the Court already noted, "[w]hile each fact standing alone may be insufficient, the combination of all the facts can establish probable cause . . . and certain conduct that may appear 'innocent to a lay person may have entirely different significance to an experienced [law enforcement] officer.'"  *Gilliam*, 167 F.3d at 633 (quoting *United States v. Catlett*, 97 F.3d at 573-74).  It also is "well-established that government agents may testify to the meaning of coded drug language under Fed. R. Evid. 702."  *United States v. Watson*, 260 F.3d 301, 307 (3d Cir. 2001).  Like the affidavit in *United States v. Johnson*, No. 99-4751, 2001 WL 127341, at *172 (4th Cir. Feb. 15, 2001) (unpublished), Special Agent Pardee's affidavit identified conversations that used language "that the [law enforcement agent] believed to be code words for a narcotics transaction.  The [law enforcement agent] provided the judge with the details of [his] training and experience, upon which [he] relied to determine that the language used in those conversations was code for a narcotics sale."  In addition, like the affidavit in *Johnson*, Special Agent Pardee's affidavit also contains sufficient factual support from which Judge Collyer could independently conclude whether probable cause existed.  *Id.* at *173.

trafficking business."

Paragraph 30: "Based upon my training and experience in this and other investigations, your affiant understands that in these conversations that [sic] SUGGS and GLOVER are using the target telephone to make arrangements for a meeting in which GLOVER will supply SUGGS with PCP."

Paragraph 31: "Based upon my training and experience in this and other investigations, including my knowledge that GLOVER supplied PCP to SUGGS on January 14, 2007, see ¶ 30, *supra*, your affiant understands that in this meeting SUGGS met with GLOVER to pay for PCP already supplied and to discuss further PCP transactions."

Paragraph 32: "At 12:13 p.m., the Tahoe drove out of a parking space and left the area. A black male wearing a denim jacket and a baseball cap was seen walking away from the Tahoe. At 12:20 p.m., the black male was observed getting into a green Chevrolet pick-up truck bearing DC tag BZ-0597. The Chevrolet pick-up truck is registered to LONNELL GLOVER, date of birth October 3, 1961, at 1820 M Street, N.E., Washington, DC."

Paragraph 33: "Based upon his training and experience in this and other investigations, the affiant believes that as in the 5:29 p.m. call, SUGGS again informed JOHNSON that he expected to receive additional drugs the following weekend. Further, your affiant believes that JOHNSON's comment indicates that the source of supply of PCP is located outside the Washington, DC metropolitan area."

Paragraph 34: "Eventually, after law enforcement sent CW-1 into the neighborhood of SUGGS' grandmother's house, SUGGS called CW-1 and they met. At the meeting SUGGS put CW-1 off when CW-1 asked to purchase PCP."

Paragraph 35: "Based upon my training and experience in this and other investigations and the entire chain of events, beginning with CW-1's attempts to contact SUGGS and SUGGS' determination to delay a cash sale (¶ 34), SUGGS meeting with GLOVER and his almost immediate attempt to contact CW-1 followed by his distribution of 16 ounces of PCP to CW-1, your affiant submits that it is clear that GLOVER supplied PCP to SUGGS who then had PCP to supply to CW-1, PCP SUGGS did not have the night before."

Paragraph 36: "Again, based upon my training and experience in this and other investigations, including my knowledge that GLOVER supplied PCP

> to SUGGS on January 20, 2007, see ¶¶ 34 and 35, *supra*, your affiant understands that in this meeting SUGGS met with GLOVER to pay for PCP already supplied and to discuss further PCP transactions."

Paragraph 46: "While the investigation to date has determined GLOVER is responsible for the distribution of substantial quantities of PCP in the Washington, D.C. area, the investigation has been unsuccessful in identifying all the purchasers within the Washington, D.C. area of the wholesale quantities of PCP being distributed by GLOVER. The evidence indicates that GLOVER sells PCP upwards of 16 ounces at a time."

*Id.* at 7-9. According to Glover, "without these exaggerations, conclusory statements and falsehoods, Judge Collyer would not have found probable cause to issue the interception Order." *Id.* Although the government admits that Special Agent Pardee's affidavit contains conclusory statements, it nevertheless argues that Special Agent Pardee properly relied on his knowledge and experience to make the statements and the defendant failed to show that Special Agent Pardee knowingly and intentionally made false statements, or did so with reckless disregard for the truth. Govt's Resp. Br. 31-32. The Court is inclined to agree with the government that the defendant did not make the showing necessary to warrant an evidentiary hearing or suppression.

The standards that govern a defendant's challenge to the veracity of an affidavit used to secure a warrant or wiretap order are set forth in the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when

14

material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

438 U.S. at 171-72. Likewise, under certain circumstances, an evidentiary hearing and suppression are an appropriate remedy if the affidavit contains "material omissions" that would defeat probable cause. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. July 11, 2008) (pet. for cert. filed).

With the exception of the statements in paragraphs 32, 34 and 46, all the statements in Special Agent Pardee's affidavit that Glover finds objectionable involve conclusions Special Agent Pardee reached based on events described in the affidavit and his interpretation of those events derived from his training and experience. Glover's Phone Suppression Mot. Ex. A ¶¶ 28-36. Paragraph 32 contains a description of events observed via surveillance, paragraph 34 appears to be based on statements made by a cooperating witness,[8] and paragraph 46 appears to be based on Special Agent Pardee's interpretation of the events that occurred January 19, 2007, and January 20, 2007. Although Glover states the reasons why he objects to Special Agent Pardee's interpretations and the identified statements, he proffered no evidence to suggest that the interpretations or statements were deliberate falsehoods or were made out of a reckless disregard

---

[8]     Paragraph 11 of the affidavit explains that Special Agent Pardee's assertions are derived in part from information and belief based on "debriefings of cooperating witnesses." Glover's Phone Suppression Mot. Ex. A ¶ 11. In addition, paragraph 34 makes clear that the cooperating witness's actions were being directed by law enforcement agents, who were monitoring the situation. *Id.* ¶ 34 (stating that the cooperating witness's telephone calls and presence in the neighborhood of Suggs's grandmother were "at the direction of law enforcement"). Paragraph 47 also states that "a portion of the information [in the affidavit] was obtained from cooperating witnesses." *Id.* ¶ 47. The affidavit also contains several paragraphs that establish the cooperating witnesses' reliability for the purpose of the factual proffers in the affidavit. *Id.* ¶¶ 17-19, 21-22, 24-25, 35.

for the truth.[9]  As a matter of fact, Glover made no proffer at all except to state that "[a]s an offer of proof and statement of supporting reasons as to Pardee's false statements, [G]lover cites Pardee's affidavits supporting the government's applications for wire intercepts, the intercepts themselves, discovery provided to date."  Glover's Phone Suppression Mot. 10.  The Court is skeptical that a wholesale proffer of essentially all the evidence in a case is what the Supreme Court envisioned when it announced in *Franks* that allegations of deliberate falsehood or reckless disregard for the truth "must be accompanied by an offer of proof."  438 U.S. at 171.

Even if such a wholesale proffer could be deemed proper under *Franks*, Glover neglected to provide the Court with copies of any of the discovery he claims support his position.  Furthermore, Glover is taking quite a gamble if he is asserting that *all* the discovery in this case is proof of his arguments.  All the discovery in this case presumably includes witness statements, records of searches that resulted in the recovery of narcotics, the other wiretap affidavits, and other materials the government intends to use in its case-in-chief,[10] which risks lending strength to Special Agent Pardee's interpretations rather than weakening them.  The Court cautions against playing such a risky game with the required burden of production under *Franks*, which, as indicated, mandates a "proffer of proof" and that "[a]ffidavits or sworn or otherwise reliable statements of witnesses" be furnished.[11]  438 U.S. at 171.  Glover offered no affidavits or other

---

[9]      Glover's objections appear to be founded on a mere disagreement with Special Agent Pardee's interpretations and conclusions.

[10]      *See* Fed. R. Crim. P. 16.

[11]      As the D.C. Circuit has pointed out, "[a] *Franks* hearing should be justified by '[a]ffidavits or sworn or otherwise reliable statements of witnesses . . . or their absence satisfactorily explained.'" *United States v. Dale*, 991 F.2d 819, 845 (D.C. Cir. 1993) (per curiam) (quoting *Franks*, 438 U.S. at 171).  "A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *United States v. Mathison*, 157 F.3d 541, 548 (8th

corroborative proof to show that Special Agent Pardee lacked conviction about his own interpretations of the events and coded conversations, that the events in actuality did not occur as described and Special Agent Pardee knew that or would have known that except for his reckless disregard of the truth, or even that Special Agent Pardee knowingly lacked the expertise to draw the conclusions he proffered in the affidavit. Glover, therefore, failed to make the preliminary showing necessary to warrant a hearing or suppression under *Franks*.

Additionally, as the Court mentioned in the prior discussion of probable cause, even stripped of the statements Glover finds objectionable the Court finds that Judge Collyer nevertheless had a substantial basis for concluding that probable cause existed. A commonsense analysis of the totality of the remaining facts points to Glover's involvement in Suggs's criminal activities, as demonstrated by the proximity of their telephone conversations and meetings to narcotics transactions Suggs engaged in with other individuals, Glover's criminal record demonstrating involvement in prior drug and weapons crimes, and the evidence collected from pen register records, among other evidence described in the affidavit. Even if this Court did not agree that probable cause was apparent, it nonetheless does not find "the affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Spencer*, 530 F.3d at 1008 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). As a result, it was objectively reasonable for law enforcement agents to rely on Judge Collyer's order as authority to intercept the communications from Glover's personal mobile phone. *Leon*, 468 U.S. at 922-24.

## III.    Necessity For Electronic Surveillance

Glover maintains that the affidavits for both the mobile phone wiretap and the truck bug

---

Cir. 1998) (citing *Franks*, 438 U.S. at 171).

are defective because they fail to establish the necessity for electronic surveillance. Glover's Phone Suppression Mot. 11-18; Glover's Truck Bug Suppression Mot. 6-8. Glover argues that the affidavit supporting the application for the mobile phone wiretap is flawed because it contains conclusory and uncorroborated opinions about the viability of other investigative techniques. Glover's Phone Suppression Mot. 11-18. Glover also urges the Court to adopt the Ninth Circuit's analysis in *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001), to find that the affidavit for the mobile phone wiretap improperly parrots the affidavit used to secure a wiretap of Suggs's mobile phone without demonstrating that particularized investigative steps were employed to investigate Glover before resorting to electronic surveillance of his phone. Glover's Reply Br. 3. Glover further argues that the affidavit for the truck bug wiretap application fails to demonstrate the necessity of electronic surveillance given that other investigative techniques proved successful. Glover's Truck Bug Suppression Mot. 7-8.

The necessity requirement in 18 U.S.C. § 2518 mandates that a wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . ." 18 U.S.C. § 2518(1)(c). Courts closely examine disputed wiretap applications "and will 'reject generalized and conclusory statements that other investigative procedures would prove unsuccessful.'" *Carter*, 449 F.3d at 1293 (quoting *United States v. Williams*, 580 F.2d 578, 588 (D.C. Cir. 1978)). It is established, however, that "[s]ections of an affidavit framed in conclusory terminology . . . 'cannot rationally be separated from . . . preceding detailed descriptions of . . . investigative events.'" *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989) (quoting *Williams*, 580 F.2d at 589). Moreover, "[b]ecause . . . the statutory command was not designed to foreclose electronic surveillance until every other imaginable method of

18

investigation has been unsuccessfully attempted, the government will meet its burden of demonstrating necessity if it shows that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *Id.* (quoting *Williams*, 580 F.2d at 588) (internal quotation marks omitted). In addition, "Circuit precedent clarifies that 'a court may authorize the wiretap of the phone of a member of an operation if traditional investigative techniques have proved inadequate to reveal the operation's full 'nature and scope.'" *Sobamowo*, 892 F.2d at 93 (quoting *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987)).

Although Glover makes a fair point that portions of the affidavit submitted to secure a wiretap of Suggs's phone likely were used as templates for the affidavit supporting the application to wiretap Glover's mobile phone, this case is distinguishable from *Blackmon* because the affidavit at issue lacks the material misstatements, omissions, and inherent generalities that were fatal to the affidavit reviewed by the Ninth Circuit.[12] The Court therefore

---

[12]     In *Blackmon*, the defendant and other individuals were indicted and charged with conspiracy to distribute a controlled substance and possession with intent to distribute cocaine. 273 F.3d at 1206. The criminal investigation involved numerous wiretaps, the first of which was secured for a phone used by a suspected narcotics trafficker. *Id.* A subsequent wiretap was secured for the defendant's phone based on an affidavit that was "with a few alterations, a duplicate of the [narcotics trafficker] wiretap affidavit." *Id.* Upon review, the Ninth Circuit determined that the affidavit supporting the wiretap of the defendant's phone was a "carbon copy" of the narcotics trafficker wiretap affidavit that contained statements applicable to the investigative techniques used for the narcotics trafficker but not the defendant. *Id.* at 1208. As a result, the Ninth Circuit concluded that the affidavit for the wiretap of the defendant's phone "contained material misstatements and omissions that worked to conceal the fact that necessity had not been established." *Id.* at 1209. To remedy the affidavit, the Ninth Circuit excised the misstatements but all that remained were "general allegations that would be true in most narcotics investigations" and "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures." *Id.* at 1210. The Ninth Circuit therefore held that the affidavit failed to establish necessity and suppressed the wiretap evidence. *Id.* at 1211.

Note that in a more recent case, *United States v. Rivera*, 527 F.3d 891, 899 (9th Cir. 2008), the Ninth Circuit distinguished *Blackmon* and upheld as sufficient an affidavit that

finds the D.C. Circuit's decisions in *Carter* and *Sobamowo* controlling and dispositive of

Glover's challenges to the demonstrations of necessity contained in the affidavits for the mobile

phone wiretap and truck bug applications.

In both *Carter* and *Sobamowo*, the D.C. Circuit rejected the defendants' contentions that

it was improper for the government to rely on material about the investigation derived from

affidavits supporting the wiretaps of other targets of the narcotics operations and to fail to

investigate the defendants by first using non-wiretap investigative methods. *Carter*, 449 F.3d at

1293; *Sobamowo*, 892 F.2d at 93. In both cases the D.C. Circuit concluded that the necessity

requirement was met by specific evidence in affidavits establishing that a drug trafficking

operation existed, the defendants were involved in the operation, and the government tried to

gather information about the defendant in other ways. In *Carter*, the only other investigative

method the government tried to use to obtain information about the defendant was physical

surveillance, which the government's affidavit stated likely would not succeed because of the

defendant's counter-surveillance methods and "because physical surveillance alone would not

generate detailed information on the activities and associates [of the members of the operation]."

449 F.3d at 124. The affidavit in *Carter* also explained why other specific methods would be

unsuccessful at revealing the nature and scope of the operation. *Id.* In *Sobamowo*, the other

investigative methods the government tried to use included contacting foreign sources and

informers, checking federal law enforcement agency records, and conducting physical

surveillance. 892 F.2d at 93. The D.C. Circuit found these efforts adequate and noted that the

government "was not required to enumerate every technique or opportunity missed or

---

"explained in reasonable detail why each confidential source or source of information was unable
or unlikely to succeed in achieving the goals of the . . . investigation."

overlooked." *Id.*

The affidavit supporting the application to wiretap Glover's personal mobile phone

contains sufficient details about a criminal investigation that exposed a drug trafficking operation

and that Glover was involved in that operation and was using the targeted mobile phone to

further his involvement.  Glover's Phone Suppression Mot. Ex. A ¶¶ 11-42.  The affidavit also

reveals that law enforcement agents employed (1) pen register records to obtain more information

about Glover, which disclosed that Glover was communicating with other suspected drug

traffickers, *see* ¶¶ 38-42, 45, (2) law enforcement agency records searches, *see* ¶ 15 (identifying

the results of criminal history searches and noting that a fingerprint comparison was performed),

(3) cooperating witnesses, albeit the cooperating witnesses were unsuccessful at dealing with

anyone higher than Suggs, *see* ¶48 (stating that "despite months of investigative efforts, the

cooperating witnesses have not managed to buy PCP from anyone higher in the chain of supply

than Suggs"), and (4) interceptions from Suggs's phone, *see* ¶ 45 (stating that no information

about Glover's supply source was intercepted and likely would not be disclosed because Glover

would never reveal his source of supply to Suggs).  The affidavit further offers sound and

reasonably detailed explanations why other methods of investigation are impractical under the

circumstances or otherwise would not work specifically for an investigation of Glover.[13]  *See id.*

---

[13]       Special Agent Pardee's affidavit explained that, although cooperating witnesses have been able to deal with Suggs, Suggs has not introduced them to Glover or even mentioned his relationship with Glover, so it is not feasible to arrange to introduce an undercover agent to Glover or to expect that Glover would introduce an undercover agent to the individuals supplying PCP to him. Glover's Phone Suppression Mot. Ex. A ¶ 44 (hereinafter all name capitalization formatting omitted).  Nor is it likely that Glover would disclose to an undercover agent any information about his sources of supply. *Id.* ¶ 46.  In addition, the pen register data indicates that Glover communicates with known drug traffickers in California but it is unlikely that Glover would reveal information about these individuals to Suggs so there is no probability of capturing this information from the wiretap of Suggs's phone. *Id.* ¶ 45.  With regard to the use of cooperating witnesses, Special Agent Pardee explained that "the manner in which CW-1 and

¶¶ 42-55.  In doing so, the affidavit avoids merely describing the inherent limitations of

traditional methods of investigation that plagued the affidavit in *Blackmon*.  Although there are

some generalized statements that could be true of any investigation of a narcotics operation, the

Court finds that the affidavit provides a detailed and case-specific analysis that explains the

problems posed by other investigative methods with respect to investigating Glover and

determining the full nature and scope of the narcotics conspiracy.

    With respect to the truck bug, Glover contests whether the affidavit supporting the truck

bug application demonstrates the necessity for electronic surveillance given that the affidavit

reveals that traditional methods of investigation were working.  Glover's Truck Bug Suppression

Mot. 7-8.  Like this Circuit, *see Sobamowo*, 892 F.2d at 93, many of the Court's sister circuits

have agreed that 18 U.S.C. § 2518(1)(c) does not mandate the exhaustion of all investigative

techniques and the partial success of other methods of investigation does not preclude authority

to wiretap.  *See United States v. Verdin-Garcia*, 516 F.3d 884, 890 (10th Cir. 2008) (noting that

"Section 2518 does not . . . mandate exhaustion of all possibilities"); *United States v. Cao*, 471

F.3d 1, 3 (1st Cir. 2006) ("Plainly the *partial* success of the investigation did not mean that there

---

CW-2 deal with the conspiracy and its members will not permit or facilitate contacts with
members of the conspiracy operating at a level above CW-1 and CW-2 normally contact." *Id.* ¶
47.  Special Agent Pardee further explained that controlled purchases have been used; however,
"while efforts by CW-1 and CW-2 to purchase drugs from Suggs, Parker and others may generate
activity involving Glover, it is clear that without the ability to monitor Glover's telephone
conversations other than those conversations with Suggs, such activity will not disclose the
extent of this conspiracy beyond Glover." *Id.*  According to Special Agent Pardee, it also "would
likely raise suspicion if the cooperating witnesses requested introduction to Glover . . . ." *Id.* ¶
48.  Special Agent Pardee also observed that physical surveillance had limited application for
several cited reasons, including because the targets of the investigation are "surveillance
conscious" and he described two incidents when law enforcement tried to conduct physical
surveillance but Suggs noticed the law enforcement vehicles. *Id.* ¶ 50.  Reasonable explanations
were offered to explain why other investigative methods – such as the use of search warrants,
grand jury testimony and witness interviews – also would be unavailing. *Id.* ¶ 52-54.

was nothing more to be done."); *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006) ("To receive a wiretap order, the government need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means."); *United States v. Thompson*, 210 F.3d 855, 859 (8th Cir. 2000) (stating that Section 2518(1)(c) "does not, however, require that law enforcement officers 'exhaust all possible techniques before applying for a wiretap'" (quoting *United States v. Shaw*, 94 F.3d 438, 441 (8th Cir. 1996)); *United States v. Khan*, 993 F.2d 1368, 1375 (9th Cir. 1993) (observing that "law enforcement officials do not have to exhaust ever investigative alternative before obtaining a wiretap"); *United States v. Gianelli*, __ F. Supp.2d __ (D. Mass. Oct. 8, 2008) (slip op.) (rejecting contention that wiretap was premature because normal investigative techniques were successful and noting that "[a]lthough the State Police had gained some information from traditional techniques, [the affiant] made clear in the affidavit that there was still much to be done that had not and could not be done by conventional wisdom").

Although the defendant is correct that the truck bug affidavit reveals that traditional investigative methods such as the use of controlled purchases, physical surveillance, cooperating witnesses, and pen registers successfully advanced the criminal investigation, the affidavit also contains reasoned explanations why these methods had limited ongoing application and failed to illuminate the full nature and scope of the conspiracy, such as how proceeds are being disposed, all the people supplying PCP to Glover, how the PCP is being manufactured, obtained and transported to the District of Columbia, the sources of cocaine, how the cocaine supply is being smuggled into the United States, and the identities of all the primary purchasers of wholesale quantities of PCP from Glover. Glover's Truck Bug Suppression Mot. ¶¶ 46-56. The affidavit also provided a thorough analysis to explain why other techniques – such as the use of

undercover agents, search warrants, and witness interviews – were impractical under the circumstances or would have proven unsuccessful. *Id.* ¶¶ 46, 48, 53, 55. Having carefully reviewed the entire affidavit, the Court concludes that it meets the necessity requirement of 18 U.S.C. § 2518(1)(c).

## IV.     Breadth of the Truck Bug Order

Glover asserts that the order authorizing the government to surreptitiously enter his truck and install a mobile telephone for the purpose of intercepting communications in and around the truck violated the Fourth Amendment because it was overly broad. Glover's Truck Bug Suppression Mot. 3-6. Glover's basis for challenging the order was premised on his belief that "federal agents seized the truck for an extended period of time during which they entered it several times to install a bug." *Id.* at 6. Glover contends that the government failed to demonstrate that it was necessary "to make an extended seizure or multiple entries" therefore the order authorizing the entry "was far too sweeping and the failure adequately to limit the authorization to enter was a fatal defect." *Id.* Glover cites *United States v. Ford*, 553 F.2d 146 (D.C. Cir. 1977), as his sole authority for the proposition that evidence must be suppressed if it results from an order that permits multiple covert entries to install a wiretap device without an adequate showing of necessity for such entries. *Id.* at 3-5. The government counters by arguing that the Supreme Court's decision in *Dahlia v. United States*, 441 U.S. 238, 255 (1979), effectively overruled the D.C. Circuit's decision in *Ford*.

In *Dahlia*, the Supreme Court recognized that the D.C. Circuit and other Federal Courts of Appeal had "given conflicting answers" to the question, among others, whether authorization for covert entry to install electronic surveillance equipment must be explicitly authorized by a court. *Id.* at 241 n.3 (citing *Ford*). After first determining that "[t]he Fourth Amendment does

not prohibit *per se* a covert entry performed for the purpose of installing otherwise legal electronic bugging equipment," *id.* at 248, the Supreme Court went on to conclude that the Fourth Amendment also "does not require that a Title III electronic surveillance order include a specific authorization to enter covertly the premises described in the order." *Id.* at 258-59. To reach this conclusion the Supreme Court explained that:

> The Fourth Amendment requires that search warrants be issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Finding these words to be precise and clear, this Court has interpreted them to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.
>
> * * *
>
> Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the three requirements discussed above, search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant-subject of course to the general Fourth Amendment protection against unreasonable searches and seizures.

*Id.* at 257 (international quotation marks and citations omitted). Accordingly, it occurs to the Court that the legality of the surreptitious entry of Glover's truck to install the bugging device must be measured by whether the seizure of the truck was reasonable under recognized Fourth Amendment standards, not whether the judicial order was overly broad.[14] The Supreme Court has stated those Fourth Amendment standards to be as follows:

> The test of reasonableness under the Fourth Amendment is not capable of precise

---

[14] Because the Supreme Court expressly cited the D.C. Circuit's decision in *Ford* as one of the cases involved in the circuit splits that ultimately were resolved by *Dahlia*, the Court is inclined to agree with the government that *Dahlia* overruled *Ford*.

> definition or mechanical application. In each case it requires a balancing of the need
> for the particular search against the invasion of personal rights that the search entails.
> Courts must consider the scope of the particular intrusion, the manner in which it is
> conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Without belaboring the point, the Court is satisfied that the seizure of Glover's truck for the purpose of installing the truck bug was reasonable under accepted Fourth Amendment standards. Contrary to Glover's characterization of multiple seizures and entries – which in fairness was made before Glover was fully apprised of the circumstances surrounding the installation of the truck bug – the facts show that on March 20, 2007, Glover's truck was seized pursuant to a valid court order for a duration of only about 30 minutes while parked in a public parking lot at Baltimore/Washington International Thurgood Marshall Airport. Govt's Resp. Br. 37. The seizure consisted of law enforcement agents disarming the truck's alarm, entering the truck, installing and testing the mobile phone that would be used to intercept communications, and then rearming and locking the truck. *Id.* The truck was never moved from the location where it was parked and that was the only time law enforcement agents entered the truck. *Id.* Based on these facts, the need for the seizure, and given Glover's diminished expectation of privacy in his truck,[15] the Court concludes that the seizure of Glover's truck to install the truck

---

[15]    As the Supreme Court has observed:

> The search of an automobile is far less intrusive on the rights protected by
> the Fourth Amendment than the search of one's person or of a building. One
> has a lesser expectation of privacy in a motor vehicle because its function is
> transportation and it seldom serves as one's residence or as the repository of
> personal effects. A car has little capacity for escaping public scrutiny. It
> travels public thoroughfares where its occupants and its contents are in plain
> view.

*Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (internal citations and quotation marks omitted).

bug was reasonable in light of the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted.

## V.    Minimization

In addition to the arguments already addressed by the Court, Glover also contends that the government failed to comply with the minimization requirement of 18 U.S.C. § 12518 (5), although he did so in only the most cursory way by seeking to adopt and conform the arguments raised by the defendants in a related case, *United States v. Suggs*, which was presided over by Judge Ellen Huvelle.  The defendants in *Suggs* moved to suppress wiretap evidence on the ground that the government failed to minimize interceptions in compliance with the statute. Judge Huvelle reviewed 149 calls and determined that only 20 of the calls should have been minimized, which was a small error rate that she concluded did not warrant suppression.  *United States v. Suggs,* 531 F. Supp. 2d 13, 24 (D.D.C. 2008).  Glover never supplied this court with the identity of the calls he challenged or even copies of the legal briefs and call lists submitted in *Suggs*.  The government, on the other hand, submitted a legal brief setting forth its arguments that the minimization requirement was complied with, which went unchallenged by the defendant. Consequently, Glover did not properly raise the issue in a matter that would permit the Court to rule on it and thereby failed to demonstrate that the government violated the minimization requirements.

## CONCLUSION

For the reasons set forth above, the Court will deny Defendant Lonnell Glover's Motion To Suppress Evidence Obtained From Interception Of Wire Communications And Seizure Of Electronic Communications and Defendant Lonnell Glover's Motion To Suppress Evidence Obtained From Interceptions Of Communications In And Within The Vicinity Of A 1998

Chevrolet Pickup Truck, District Of Columbia Registration BZ0597.  An appropriate Order will accompany this Memorandum Opinion.

October 22, 2008

Thomas F. Hogan
United States District Judge